No. 8.—JOHN H. WYLEY, plaintiff in error, *vs.* JOHN R. STAN-
FORD, defendant in error.

[1.] The Court is not bound to give in charge, a request not warranted by the
evidence.

[2.] The dismissal of a levy made on realty of the principal, by the plaintiff, in
*fi. fa.* does not prejudice the surety to the *fi. fa.*, and therefore does not dis-
charge him.

[3.] The Court told the jury, that the evidence on a particular point, was such,
that it was impossible to come to any correct conclusion on the point.

*Held,* That this was not the expression, or the intimation of the opinion of the
Court, as to what had, or had not, been proved on the point.

Illegality, in Habersham Superior Court. Tried before
Judge JACKSON, at October Term, 1856.

Hyatt, McBurney & Co., recovered judgment in Haber-
sham Superior Court, against Thompson Allan and John H.
Wyley, principals, and Robert Allan security, for the sum of
eight hundred and fifty-four dollars and ten cents principal,
besides interest and cost of suit. This judgment was signed
10th April, 1854, and a *fi. fa.* issued the same day, which
was levied on a lot of land as the property of Wyley, who
filed his affidavit of illegality on the ground:

1st. That there had been a prior levy on a house and lot
belonging to Thompson Allan, not accounted for.

2d. Because deponent, although ostensibly a principal in
the *fi. fa.*, is in fact only a security, and that plaintiffs have
extended such indulgence to Thompson Allan, the real prin-
cipal, as operates a discharge of deponent's liability.

3d. Because said *fi, fia.* has been fully paid off and dis-
charged.

Upon the trial, defendant Wyley, read the answers of *James
P. Simmons* to interrogatories, who testified, that he sold to
Thompson Allan the house and lot in the village of Law-
renceville, which had been levied on by virtue of the *fi. fa.*
in favor of Hyatt, McBurney & Co., and conveyed to him the

fee simple title thereto, and does not know of any other claim
or title to said lot, than his own, at the time he sold it; that
he traded one of the notes which was given for the purchase
money to Robert B. Camp; that the present value of the
house and lot is about fifteen hundred dollars. He has been
of opinion that Allan was good for his debts, up to the time
he assigned his property to John R. Stanford, which was done
some time last fall, of this, however, he knows but little, ex-
cept from report. Allan had in his possession at the time of
his assignment, the house and lot, with a fair stock of goods,
(the latter held by the firm of Allan & Stanford,) an old ne-
gro woman, a horse and buggy, a tract of some sixty acres of
land, near Lawrenceville, household and kitchen furniture,
&c., with doubtless other property, that witness cannot think
of; a part of the purchase money for the house and lot, and
for the land, has not yet been paid. Up to the time of the
assignment, he was of opinion, that a debt of the amount of
said *fi. fa.* might have been made out of Allan, but has since
learned facts not then known, as to the title to some of the
property, and of liens, which render it doubtful whether such
debt could have been collected by law then, but believes it
could have been. He sold said house and lot to Allan, for
seven hundred dollars, but it has been much improved by
Allan since; considered him good for his debts up to the
time of the assignment referred to, but has since learned that
he was then insolvent. Does not know how long he has
been insolvent.

*Robert B. Camp*, testifies, that when said house and lot
was levied on, he filed his claim, which he expected to sustain
upon the ground of a vendor's lien, having purchased one of
the notes given for the purchase money. The note was re-
newed, and dated the 1st of January, 1853, due twelve months
after date, signed by Thompson Allan, and John R. Stanford
security, and upon which suit was instituted to the December
Term last, of the Superior Court. Suit is still pending.—

Allan paid fourteen dollars and twenty cents, 21st December, 1853, and six dollars and twenty cents, 1st January, 1855.

*Augustus C. Wyley*, in answer to interrogatories, testifies: That he was the clerk of Hyatt, McBurney & Co., and their agent to collect and settle the original indebtedness of Allan and John H. Wyley. He settled the same by dividing the demand into two notes of equal amount, and required of Thompson Allan a good security to one of the notes, and of John H. Wyley a good security to the other. Thompson Allan gave for his security his brother Robert Allan; John H. Wyley gave for his security his father James R. Wyley. These notes were dated 31st March, 1852, and payable twelve months after date, with interest from date. Gave time, in order to get the debt secured beyond a doubt. Thompson Allan pledged his word at the time of the settlement, that he would pay every dollar of the note to which Robert Allan was security, out of his individual means, and said he thought he would be able to pay it before the twelve months, given in the note, was out. John H. Wyley said the same thing, in regard to the note to which James R. Wyley was security. John H. paid all his part of said debt to plaintiff. Allan paid six hundred dollars toward his part, on the 28th September, 1854, and promised to pay the balance in a few days. I granted indulgence to him for the balance, simply because he was at that time associated with John R. Stanford in the mercantile business; Stanford being an old customer of the plaintiff.

Shortly after this, witness returned to Charleston with the *fi. fa.*, and delivered it to plaintiffs, who retained it until about the 1st of November, 1855, when witness starting out on a collecting tour, carried the *fi. fa.* with him.

The debt could have been made out of Allan at any time within the last two years, if the plaintiffs had seen proper to have handed the *fi. fa.* to the Sheriff of the county where he resided.

To the fourth interrogatory, he answers: That it was a special agreement between himself as the agent of plaintiffs, and John H. Wyley and Thompson Allan, that Wyley should out of his individual means, pay one-half of the original indebtedness, and that Allan should pay one-half out of his individual means. Wyley agreeing to pay the note to which his father was security, and Allan agreeing to pay the note to which Robert Allan was security: required both defendants to sign both notes as principals, so that in case of failure to realize the money on either of the notes, from the defendant agreeing to pay the same, the plaintiffs might proceed to make the money directly out of the other defendant. It was, however understood, that Thompson Allan and James R. Wyley were securities for John H. Wyley, and that John H. Wyley and Robert Allan were securities for Thompson Allan,

To the fifth interrogatory, he answers: That Thompson Allan paid six hundred dollars on the *fi. fa.*, 28th September, 1854, and promised to pay the balance in a few days.

To the sixth interrogatory, he answers: That the whole amount due on the *fi. fa.* has been paid; six hundred dollars was paid by Thompson Allan, the balance was paid by John R. Stanford, 23d November, 1855.

To the seventh interrogatory, witness answers: That Thompson Allan always acknowledged this as his own individual debt.

To the first cross interrogatory, witness says : John H. Wyley and Thompson Allan, composed the firm of John H. Wyley & Co. The original debt, of which the *fi. fa.* is a part, was due from this firm, and was contracted in the year 1848. Plaintiffs always gave witness a *carte blanche*, to act according to the best of his judgment when transacting business for them.

To the third cross interrogatory: John H. Wyley is my brother.

To the fourth cross interrogatory : Witness took the *fi. fa.* out of the Sheriff's office of Habersham county, about the

1st of June, 1854, and carried it to Lawrenceville, where Thompson Allan resided, and told him of his agreement at the time the note was given, and was willing for him to say what I should do with the *fi. fa.* He replied, that I was extending more kindness to him than he could have expected, and begged me as a personal favor to hold the *fi. fa.* until the last of August, and by that time he could certainly pay it off: said that he knew the debt had to be paid, and that he was the proper person to pay it. Witness yielded to his request, and retained the *fi. fa.* till he re-visited Lawrenceville in September, 1854, when Allan paid six hundred dollars as already stated, and promised to pay the balance in a few days. Directly after this, he returned to Charleston and delivered the *fi. fa.* to plaintiffs, in whose possession it remained till about the 1st of November, 1855, when witness carried it again to Lawrenceville. On the 20th November, 1855, Thompson Allan informed me that he and John R. Stanford had dissolved, and that Stanford was in possession of the assets: he told me, however, that the money could be made out of his property, as every thing he had owned for eighteen months or more, prior to their dissolution, was subject to this *fi. fa.* Witness handed the *fi. fa.* to N. L. Hutchins, attorney at law, and requested him to make the money on it. He assured me there was plenty of property which had belonged to Allan to bring the money at an early day.

To the fifth cross interrogatory, he answers: That plaintiffs, Hyatt, McBurney & Co. did give John R. Stanford an order on the Sheriff of Gwinnett county, for the *fi. fa.*, but as well as recollected, nothing was said about when it came into his hands. Plaintiffs had been informed by Stanford, that I had placed the *fi. fa.* in the hands of the Sheriff, with instructions to sell Allan's property right away. Plaintiff wrote to me to know if this was true; my answer was " it is a lie." This was about the 1st of July, 1854.

To the sixth cross interrogatory, witness says: I informed plaintiffs in July, 1854, that I had the *fi. fa.* still in my pos-

session, and that Stanford's assertions to the contrary, were without foundation. I did not keep possession of the *fi. fa.* till it was ordered by me to be levied in Gwinnett, but on the contrary, I returned it to plaintiffs, who had it about a year, when I took it with me about 1st November, 1855.

To the seventh cross interrogatory, witness says: Allan owned, as he himself told me, a store house and lot with improvements thereon, which was subject to the *fi. fa.*, and on which it might have been levied, and the money made. Never heard anything about Stanford being security for Allan for the purchase money for said house and lot.

To the eighth cross interrogatory, answers: That it was his understanding, that after Wyley & Allan dissolved copartnership, all the notes and accounts were left in Wyley's hands; the goods on hand and other property, were equally divided between them; and at the time the debt to plaintiffs was divided, and the two notes given, it appeared to the satisfaction of Allan and myself, that Wyley had paid over all money collected by him on the notes and accounts in his hands, to the creditors of the firm, and that the notes and accounts still uncollected were not sufficient to pay off all their liabilities, and it was for this reason, that their indebtedness to plaintiffs was arranged as it was, into two parts, Wyley agreeing to pay one part and Allan the other.

John R. Stanford who had control of the *fi. fa.* introduced the following letter from defendant Wyley, viz:

CLARKSVILLE, July 14, 1853.

T. ALLAN, ESQ:

Dear Sir: The two notes we gave Hyatt, McBurney & Co. for over eight hundred dollars each, have been placed in Stanford's hands for collection, and for the purpose of collecting both notes off of me, and out of my individual means, (if I should have so much) and what seems strange to me is, that this should have been done at your suggestion, and request, for the purpose, as I am told, that you may save yourself. I

am certain that I told you, that the assets of our business would never pay our debts, and this I had no idea you doubted for a moment; and I am sure that it never entered my head, that I was to make any preparation to meet the note that you gave, and I know that you intended to pay it out of your own means when you gave it, for you will recollect that you were desirous to have the payment put off as far as possible, as there were other demands against you, that had to be paid in the meantime. You certainly do recollect, that you stated, that you could pay your note, if you could get the time above stated, viz: to the 30th March, last. I feel confident, and am encouraged so to feel, from every act of your life, of which I have been cognizable, and from all our dealings, which have been considerable, that when you examine our books, papers and all our business, that you will be satisfied that our business cannot pay itself out of debt nor come within gun-shot of it; and when you are so convinced, I know you will not stand aloof and permit all the burden and weight of our mutual indebtedness to fall upon me, who have never, until very recently, heard a word of complaint from you, as to any of my conduct in our business. I can by a very short statement show you beyond a reasonable doubt, that it would be unreasonable to suppose our business could pay its own debts: We had invested in this business $1,300 each, making $2,600. We did business two years; at the end of these two years, our own accounts amounted to over $3,000; when we dissolved partnership and divided the stock on hand, it amounted to $3,000, or thereabouts; these two items taken together, make the sum of $6,000 taken out of the business against $2,600 put in, leaving us indebted to the business $3,400. Now, it is not reasonable to suppose, that we made money so fast as to leave sufficient assets in the establishment to pay its debts, after abstracting so large an amount in so short a time, to say nothing of bad debts and expenses. This view of the matter, I feel assured, will convince you, that you have acted

prematurely and without having sufficiently examined the business, in coming to the conclusion that I had appropriated the funds that should belong to us, to my own individual purposes—directly the reverse will be shown to be true, upon an investigation of all the business. I am sure that I have paid towards our debts more than I have ever collected from the debts due us. It would be idle for me to say that I have acted with much greater care and caution in our cash accounts, than I ever did with my own. I am sure that if you had been at my elbow I could not have acted with more fairness and uprightness than I have done; and I am now, not only willing, but anxious to pass the ordeal of an investigation of the whole business, by a committee of the most intelligent Masons and business men that can be produced; I care not who they may be, nor from what community they are selected, I shall not fear the result. If I shall prove to be in arrears with the concern, I shall promptly meet the odds that may be found against me, and our dealings and intercourse for the space of over twelve years, has furnished me with no cause or reason to doubt, that you will do likewise.

What I now have to ask is, that you come up and make a full and thorough investigation into the whole matter, that we may see how we stand, and that we may know and determine what to do, as something *must now* be done. I will be exceedingly glad if you will come as soon as practicable; if you can, come next week; write when you can come, that I may be sure to be at home, as I am occasionally absent, and might be when you come, if I were not advised as to the time when you were coming.

Yours, truly,

JOHN H. WYLEY.

The testimony being closed, counsel for John H. Wyley, requested the Court to charge the jury:

1st. That if they believe that Augustus C. Wyley as agent

of Hyatt, McBurney & Co., made an arrangement that John H. Wyley & Robert Allan were sureties, although Wyley appears as principal, that fact makes him a surety *only*.

2d. That if in this case the jury believe that arrangements were made between the agent of plaintiffs and Allan by which Allan was given indulgence without the knowledge of Wyley, and by which Allan became less able to pay in the end, Wyley is discharged.

3d. That if the jury believe that all the assets of Allan went into the hands of Stanford at or near the time when Stanford became the owner of the *fi fa.*, and that they were sufficient to pay the debt, it would be a fraud upon the rights of Wyley (if he was only a surety) to enforce the *fi. fa.*, and the same is in law satisfied.

4th. That when a party like Col. Stanford buys property, and has it transferred to himself, which is first liable to a judgment, and afterwards buys the *fi. fa.* to protect his transfer, he cannot afterwards go upon a party who is liable secondarily for the payment.

Which charges the Court refused to give, but charged the jury in substance as follows, viz :

That there were three grounds of illegality taken in this case :

1st. That the dismissal of the levy on the real estate of Allan in Lawrenceville, extinguished the debt as to Wyley. The Court charged that it did not.

2d. That the alleged transfer of certain property belonging to Allan, in Lawrenceville, to Stanford, extinguished the debt as to Wyley. Upon this point the Court charged, that there was something said about a mortgage and transfer, but there was such confusion about the matter; no legal evidence of what the mortgage was for; how much; upon what property; to secure what debt; that it was impossible for the Court and jury to come to any correct conclusion about it.

The 3d ground of illegality was that Wyley being only surety upon the note, the foundation of the *fi. fa.*, indulgence

had been extended toward the principal, Allan, which relieved in law the security. Upon this head, the Court charged, that the defendant Wyley must show to them two things: first, that he was security only; and, second, that acts had been done by Hyatt, McBurney & Co., or Stanford, which increased his risk or injured him. And first, as to his being only security, the whole question would turn upon what construction they would put upon the testimony of A. C. Wyley.

The Court remarked, that the jury would observe, there was apparently some contradiction in his testimony, on the surface. If the witness meant that he required both Allan and Wyley to sign as principals, and to be principals as to Hyatt, McBurney & Co. while they would be only securities as to each other, then, while Wyley might be only security as to Allan, he still would be principal as to Hyatt, McBurney & Co. and Stanford, the transferee, who stood in their shoes; but if they believed the arrangement was, and the witness so meant to say, that Wyley, though signing the note as principal, was to be held as security, not only to Allan, and in reference to a future settlement between them, but also as to Hyatt, McBurney & Co., then he was security only to Stanford, the transferee, and being such security, if Stanford, or Hyatt, McBurney & Co. had indulged Allan, without the knowledge and consent of Wyley, or done any act without his knowledge or consent, which increased his risk, or injured him, the security was released and discharged from the debt. The Court put the whole case upon two points; first, whether Wyley was only security; and second, whether Stanford, or Hyatt, McBurney & Co. had indulged Allan so as to injure or increase the risk of Wyley.

The jury found for plaintiffs in the *fi. fa.*, and that the same was proceeding legally.

Whereupon, counsel for Wyley moved for a new trial, on the grounds, that the refusal of the Court to charge as requested, and the charge as given, were erroneous, and because the verdict was contrary to law, and against the evidence.

The Court overruled the motion for a new trial, and coun-sel for Wyley excepted.

PEEPLES & HULL, for plaintiff in error.

JOHN R. STANFORD, *in propria persona*, for defendant in error.

*By the Court.*—BENNING, J. delivering the opinion.

Was the Court below right in refusing a new trial?

That, of course, depends on whether any one of the grounds of the motion for a new trial was sufficient.

The first ground of that motion was, the refusal of the Court to give *the requests* in charge to the jury.

The first request was in substance, that, if an "arrangement" of the original debt was made by the agent of the holders of the debt, the effect was, to render John H. Wyley only a surety, although his name might appear as a principal.

[1.] Now the evidence as to this "arrangement" was such as to leave it doubtful, whether John H. Wyley was not to bear towards *the holders* of the debt the relation of *principal,* and not that of surety.   See the answer of Augustus C. Wyley to the fourth direct interrogatory.

But if the evidence was such as to leave this doubtful, it is manifest, that for the Court to have told the jury as requested, that the arrangement, if made, would render Wyley *only* a surety, would have been wrong.   What the Court ought to have done in such a case, it did: it called the attention of the jury to the character of the evidence, and left them to decide what the evidence proved.   See the part of the charge relating to the third ground of illegality.

The second request went on the assumption, that there was something in the evidence to authorize the jury to believe, that some arrangement, i. e. of course, some *binding* arrangement, was made by the holders of the note, and one

of the makers of it, Allan, by which Allan obtained indulgence on the note.

But, in truth, there was nothing in the evidence to authorize the jury to believe any such thing.

Besides, the request also tacitly assumes, that John C. Wyley was but a surety; and yet it was doubtful, as we have seen, whether he was not a principal.

A request to be good must have evidence to rest on.

As to the third request, there are two or three things to be said:

1st. The evidence hardly justifies a request, assuming that *all* the assets of Allan went into the hands of Stanford.

2d. But if it does, it does not show, that they may not have properly gone into his hands. It may be, therefore, that they went into his hands to satisfy some debt having *precedence* of this debt.

At least, it may be that they went into his hands to satisfy a debt of equal claim, or equity, with this. And if so, the effect ought not to be to "satisfy" this debt, unless at least, the assets were sufficient to satisfy both debts. And the evidence rather is, that the assets were not sufficient to satisfy both debts.

3d. It may well be doubted, whether in any case, the transfer could work a *satisfaction* of this debt *at law*. And the proceeding was at law, being an affidavit of illegality.

As to the fourth request, there is this to be said: first, it, like the rest, assumes that Wyley was only "secondarily" liable: secondly, the evidence does not show whether the property bought by Stanford, was "first liable" to the judgment or not. The evidence does not show what was the nature of the claim or right which Stanford had against Allan, from whom he got the property.

The next ground taken in the motion, was that the *charges* were erroneous.

The charge was in three parts. The first part was, that the

dismissal of the levy by the plaintiffs in the *fi. fa.* did not extinguish the debt.

The levy was one on real property. The dismissal of a levy on real property by the plaintiff in the *fi. fa.* does not extinguish the debt. Authority is not needed to establish this.

[2.] It is equally manifest, that the dismissal of such a levy, although it be on the property of the principal, cannot hurt the surety, for the lien of the judgment on the property remains unaffected, and the property being realty, cannot be removed, and the lien of the judgment is one to which the surety becomes entitled, the moment he pays the debt. 2d section of Act of 1831, amendatory of an Act to define the liability of sureties. *Cobb's Dig.* 595.

The first part of the charge, then, was not erroneous.

[3.] The second part of the charge, was objected to, as being obnoxious to these words of the Act of 1850, to prevent Judges from making "certain charges," &c., viz: "It shall not be lawful for any or either of the Judges of the several Superior Courts of this State, in any Court whether civil or criminal, or in equity, during its progress, or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved. *Cobb's Dig.* 452.

But we do not find that it is. It is very certain that the Court in this part of the charge does not say that one thing or another has been *proved* or *not proved.*

The same remark may be made as to the observation of the Court, uttered "during the progress" of the trial, and at the time when it was deciding a motion to dismiss the illegality, especially as the observation was called out by the nature of the motion, and the motion was a motion made by the party excepting to the observation.

And it is equally true, that this objection does not lie to the third part of the charge; and this was the only objection urged against that part of the charge.

The Court told the jury, that the testimony of Wyley, on a particular point, was open to two constructions; and what

Wyley vs. Stanford.

they were; but it did not tell them which to take.    What the Court told them  was true, and  it  did not amount to the expression, or the intimation of  the Court's opinion, as  to which of  the two constructions was the true one.

Upon the whole, we find no error in the charge.

Nor do we think that the verdict was contrary  to the evidence.

The result therefore is, that the judgment of the  Court, refusing a new trial, must be affirmed.

Judgment affirmed.